IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
GREENVILLE DIVISION

PERRY PARKER                                                                               PLAINTIFF

v.                                                              CIVIL ACTION NO. 4:11-CV-00095-GHD-JMV

PROTEIN PRODUCTS                                                                     THE DEFENDANT

MEMORANDUM OPINION GRANTING
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Presently before the Court is the Defendant's motion for summary judgment [32]. After thoroughly reviewing the motion, response, reply, corresponding briefs, and attachments, and giving due consideration to the fact that the Plaintiff filed his complaint *pro se* and only later retained counsel to represent him, the Court finds that the Defendant's motion for summary judgment [32] should be granted.

*A. Factual and Procedural Background*

Perry Parker (the "Plaintiff"), an African-American male, brings this race discrimination suit against his former employer, Protein Products (the "Defendant" or "Protein Products"). Protein Products is a Sunflower County-based company in the business of manufacturing protein meal by processing fish and chicken byproducts from the commercial catfish- and chicken-processing industries. The protein meal is sold primarily to the pet food industry.

On July 13, 1988, Protein Products hired the Plaintiff as an operator and then a few years later promoted him to a supervisor position. At that time, Protein Products had three supervisors, each assigned to a daily eight-hour shift and responsible for ensuring that products met customer specifications, handling the in-bound and out-bound logistics, overseeing the environmental aspect of the facility, ensuring plant safety, and directly supervising all employees working the supervisor's shift. On July 22, 2010, the Plaintiff was demoted from his supervisor position to a

1

lead operator position. In his *pro se* complaint [1], the Plaintiff alleges that despite twenty-two years of employment with Protein Products, he was demoted, terminated, and replaced based on his race. The Plaintiff avers that the Defendant's alleged actions constitute a violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, and brings his claims under the Rehabilitation Act of 1973, as well as 42 U.S.C. §§ 1981 and 1983. Shortly after the Plaintiff filed his *pro se* complaint, he retained counsel to represent him. The Defendant filed an answer [6], and discovery ensued.

Protein Products now moves the Court to grant summary judgment on the Plaintiff's claims and argues that "[t]his is not a case about race discrimination, but instead about a long[-]term employee's inability to adapt to the managerial and quality requirements of a new product line." Def.'s MSJ [32] ¶ 5. The Plaintiff has filed a response, and the Defendant has filed a reply. The matter is now ripe for review.

### B. *Summary Judgment Standard*

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). *See* FED. R. CIV. P. 56(a); *Weaver v. CCA Indus., Inc.*, 529 F.3d 335, 339 (5th Cir. 2008). The rule "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a sufficient showing to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322, 106 S. Ct. 2548.

The party moving for summary judgment bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the record it believes demonstrate the absence of a genuine dispute of material fact. *Id.* at 323, 106 S. Ct. 2548. Under Rule 56(a), the burden then shifts to the non-movant to "go beyond the pleadings and by . . . affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.' " *Id.* at 324, 106 S. Ct. 2548; *Littlefield v. Forney Indep. Sch. Dist.*, 268 F.3d 275, 282 (5th Cir. 2001); *Willis v. Roche Biomedical Labs., Inc.*, 61 F.3d 313, 315 (5th Cir. 1995).

Where, as here, the parties dispute the facts, the Court must view the facts and draw reasonable inferences in the light most favorable to the plaintiff. *Scott v. Harris*, 550 U.S. 372, 378, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007) (internal citations omitted). "However, a nonmovant may not overcome the summary judgment standard with conclusional allegations, unsupported assertions, or presentation of only a scintilla of evidence." *McClure v. Boles*, No. 11–41345, 2012 WL 5285103, at *1 (5th Cir. Oct. 26, 2012) (per curiam) (citing *Hathaway v. Bazany*, 507 F.3d 312, 319 (5th Cir. 2007)).

*C. Analysis and Discussion*

The Defendant argues that summary judgment should be granted on the Plaintiff's race discrimination claims, which are asserted under the Rehabilitation Act of 1973, 42 U.S.C. § 1983, and 42 U.S.C. § 1981. The Court will address each claim in turn.

*i. Rehabilitation Act of 1973 Claim*

First, the Plaintiff asserts a race discrimination claim under the Rehabilitation Act of 1973, a precursor to the Americans with Disabilities Act. To establish a disability discrimination claim, a plaintiff may present direct evidence of discrimination; where no direct evidence exists,

as here, the method of proof followed is the familiar burden-shifting framework in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S. Ct. 1817, 36 L.Ed.2d 668 (1973). *See Daigle v. Liberty Life Ins. Co.*, 70 F.3d 394, 396 (5th Cir. 1995). Thus, first, the plaintiff must establish a prima facie case of disability discrimination; second, if the plaintiff meets his burden, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its adverse employment action; and at that point, "[t]he employer's intent is a question of fact, for which the plaintiff carries the burden of persuasion." *Id.* (internal citation omitted).

To establish a prima facie case under the Rehabilitation Act, a plaintiff must show that "(1) he or she suffers from a disability; (2) he or she is qualified for the job; (3) he or she was subject to an adverse employment action; and (4) he or she was replaced by a non-disabled person or was treated less favorably than non-disabled employees." *Id.* In the case *sub judice*, The Plaintiff conceded in his deposition that he has no kind of physical or mental disability that prevented him from doing his job or rendered his job difficult to perform, and thus that he cannot establish this element of his prima facie case. *See* Pl.'s Dep. [32-3] at 16. Consequently, the Court finds that summary judgment is proper on the Plaintiff's Rehabilitation Act claim.

### ii. Equal Protection Claims

Second, the Plaintiff asserts race discrimination claims under the Equal Protection Clause of the Fourteenth Amendment and 42 U.S.C. § 1983. "The Equal Protection Clause reaches only state actors, but [Section] 1983 equal protection claims may be brought against individuals as well as municipalities and certain other state entities." *See Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 257, 129 S. Ct. 788, 172 L. Ed. 2d 582 (2009) (citing *West v. Atkins*, 487 U.S. 42, 48–51, 108 S. Ct. 2250, 101 L. Ed. 2d 40 (1988)).

In a Section 1983 equal protection claim, the plaintiff "must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West*, 487 U.S. at 48, 108 S. Ct. 2250 (internal citations omitted); *see also Morris v. Dillard Dep't Stores, Inc.*, 277 F.3d 743, 747–48 (5th Cir. 2001) (discussing state action requirement). "[A] private entity acts under color of state law when that entity performs a function which is traditionally the exclusive province of the state." *Rosborough v. Mgmt. & Training Corp.*, 350 F.3d 459, 460 (5th Cir. 2003) (per curiam) (internal quotation marks and citation omitted); *see also Evans v. Newton*, 382 U.S. 296, 299, 86 S. Ct. 486, 15 L. Ed. 2d 373 (1966) (noting that a private entity operates as a state actor when it is "endowed by the State with powers or functions governmental in nature").

The Court finds that the Plaintiff has failed to show that the Defendant, a private entity, was a state actor for purposes of Section 1983. Because the Plaintiff's Section 1983 race discrimination claim raises no viable constitutional or federal claim against a state actor, summary judgment is proper as to this claim. *See Perez v. Ormiston*, 364 F. App'x 93, 2010 WL 376424, at *1 (5th Cir. Feb. 3, 2010).

*iii. Section 1981 Race Discrimination Claim*

Third, the Plaintiff claims the Defendant discriminated against him based on his race in violation of 42 U.S.C. § 1981. Section 1981, known as the "equal contracts rights" provision, was enacted shortly after the Civil War and provides in pertinent part that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens." 42 U.S.C. § 1981(a). Section 1981 defines "make and enforce contracts" as including "the making, performance, modification,

and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b).

Although Section 1981 refers to contractual rights, the Fifth Circuit has stated that "irrespective of being subject to at-will termination, [an at-will] employee stands in a contractual relationship with his employer and thus may maintain a cause of action under [Section] 1981." *Fadeyi v. Planned Parenthood Ass'n of Lubbock, Inc.*, 160 F.3d 1048, 1050 (5th Cir. 1998). Thus, although the parties agree that the Plaintiff never signed an employment contract and was an at-will employee, *see* Pl.'s Dep. [32-3] at 17–18; Def.'s Mem. Br. Supp. MSJ [3] at 3, the absence of an employment contract does not preclude the Plaintiff's Section 1981 claim.

"To establish a prima facie case under [S]ection 1981, a plaintiff must produce direct or circumstantial evidence of purposeful discrimination by the defendant." *Jatoi v. Hurst-Euless-Bedford Hosp. Auth.*, 807 F.2d 1214, 1219 (5th Cir. 1987) (citing *Ramirez v. Sloss*, 615 F.2d 163, 168 (5th Cir. 1980)). When there is no direct evidence of unlawful discrimination, as here, Section 1981 race discrimination claims are analyzed under the same evidentiary framework as Title VII claims. *Taylor v. Seton Brackenridge Hosp.*, 349 F. App'x 874, 876–77 (5th Cir. 2009) (citing *Flanagan v. Aaron E. Henry Cmty. Health Sevs. Ctr.*, 876 F.2d 1231, 1233 (5th Cir. 1989); *Roberson v. Alltel Info. Servs.*, 373 F.3d 647, 651 (5th Cir. 2004)). Thus, in the case *sub judice*, the Court will analyze the Plaintiff's Section 1981 race discrimination claim using the *McDonnell Douglas* framework.

Under *McDonnell Douglas*, an employee alleging racial discrimination against his employer based on circumstantial evidence must first establish a prima facie case of discrimination. *McDonnell Douglas*, 411 U.S. at 802, 93 S. Ct. 1817. The burden then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment

action. *Id.*, 411 U.S. at 802, 93 S. Ct. 1817. Only then does the presumption of discrimination disappear and the burden shift back to the plaintiff to show pretext.[1] The Court notes that even under *McDonnell Douglas*'s burden-shifting framework, the ultimate burden remains with the plaintiff. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000) (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981)). With the foregoing in mind, Court will examine each element of the *McDonnell Douglas* framework in turn.

*1. Prima Facie Case of Race Discrimination*

Under *McDonnell Douglas*, the plaintiff must first make a prima facie case of race discrimination, which is to say, the plaintiff must demonstrate that he: "(1) is a member of a protected group; (2) was qualified for the position at issue; (3) was discharged or suffered some adverse employment action by the employer; and (4) was replaced by someone outside his protected group or was treated less favorably than other similarly situated employees outside the protected group." *McCoy v. City of Shreveport*, 492 F.3d 551, 556–57 (5th Cir. 2007).

It is undisputed that (1) the Plaintiff is in a protected group; (2) was qualified for the position at issue; and (3) was demoted,[2] which constitutes an adverse employment action. *See*

---

[1] The Plaintiff does not present a mixed-motives argument. The Court notes that in the Fifth Circuit the mixed-motive framework has not yet been extended to Section 1981 claims, and it is unclear how far the United States Supreme Court's holding in *Gross v. FBL Financial Services, Inc.* has scaled back the extension of the mixed-motive application. *See generally Gross*, 557 U.S. 167, 129 S. Ct. 2343, 174 L. Ed. 2d 119 (2009); *see also Crouch v. JC Penney Corp.*, 337 F. App'x 399, 402, n.1 (2009) (finding that *Gross* "raises the question of whether the mixed-motive framework is available to plaintiffs alleging discrimination outside of the Title VII framework"). The mixed-motive framework's applicability is further called into question by the decisions of other circuits that had previously addressed the question and found it inapposite in Section 1981 claims even prior to the Supreme Court's holding in *Gross*. *See Mabra v. United Food & Commercial Workers Local Union No. 1996*, 176 F.3d 1357, 1357 (11th Cir. 1999) (comparing the language of both statutes and determining an extension of the mixed-motive framework to Section 1981 claim would be inappropriate); *Aquino v. Honda of Am., Inc.*, 158 F. App'x 667, 676 (6th Cir. 2005) ("Congress inserted the specific statutory provision [supporting the mixed-motive framework] only into Title VII . . . it did not amend [Section] 1981 in an analogous fashion").

[2] Although the Plaintiff seems to equivocate when he testified in his deposition that his supervisors never told him anything about demotion but instead told him that someone else would run his shift and the company would

*Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 768, 118 S. Ct. 2257, 141 L. Ed. 2d 633 (1998); *Schirle v. Sokudo USA, L.L.C.*, 484 F. App'x 893, 898 (5th Cir. 2012) (citing *Pegram v. Honeywell, Inc.*, 361 F.3d 272, 282 (5th Cir. 2004)).

The Defendant contends that the Plaintiff's prima facie case fails on the fourth element, as the Plaintiff has not shown either that he was treated less favorably than other similarly situated employees outside his protected class or that he was replaced by someone outside his protected class. The Court finds in reviewing the record that the Plaintiff has made only vague allegations that he was treated less favorably than Caucasian employees similarly situated,[3] and that the Plaintiff has presented little to no evidence that he was replaced by a Caucasian male.[4] It would appear to this Court that the Plaintiff has failed to make the requisite minimal showing that he was either replaced by an employee outside his protected class or treated less favorably than other similarly situated employees outside his protected class. However, the Court notes that the Fifth Circuit has stated that the plaintiff "need only make a very minimal showing" to establish a prima facie case. *See Nichols v. Loral Vought Sys. Corp.*, 81 F.3d 38, 41 (5th Cir.

---

"find something else for [him] to do," *see* Pl.'s Dep. [32-3] at 37, the Plaintiff acknowledges in his complaint that he was demoted on July 22, 2010 to a lead operator position, *see* Pl.'s Compl. [1] ¶ 3. The Court is satisfied that the parties agree that the Plaintiff was demoted.

[3] The Plaintiff alleges that "the Defendant looked at [him] as another uneducated, expendable black worker who would never question anything the white supervisor and white plant manager did." Pl.'s Resp. Opp'n to Def.'s MSJ [36] at 5. The Plaintiff further maintains that the racial makeup in the Defendant's plant is "culturally unrepresentative," as "[t]here are no minorities in upper management/administration" and only "one African-American supervisor," despite that "[a]ll of the other workers are minorities except for one white male." Pl.'s Compl. [1] ¶ 3.

[4] The Plaintiff initially alleges in his complaint that (1) he was required to train a Caucasian male named Michael Wagner; (2) Wagner would replace him as supervisor; (3) Wagner would be replaced by another Caucasian male; and (4) the other Caucasian male ultimately would be replaced by an African-American male named Buddy McCaleb, but only after the Plaintiff contacted the EEOC. Pl.'s Compl. [1] ¶ 3. Similarly, the Plaintiff argues in his response to the motion for summary that he was instructed to train Wagner for a management position, but that the Plaintiff "would later discover that his training of [Wagner] would lead to Wagner taking the position that [the Plaintiff] held." Pl.'s Resp. Opp'n to Def.'s MSJ [36] at 2. However, in the Plaintiff's deposition, the Plaintiff concedes that Wagner was "just a [management] trainee" who returned to Texas after a short training stint at the plant, and that Wagner never actually replaced the Plaintiff. Pl.'s Dep. [32-3] at 46, 48–49. And only in his complaint does the Plaintiff refer to an alleged second Caucasian male who was allegedly replaced by McCaleb, an African-American male.

1996). Even assuming, *arguendo*, that the Plaintiff has made a prima facie case of race discrimination under Section 1981, Protein Products has articulated a legitimate, nondiscriminatory reason for the Plaintiff's demotion, and the Plaintiff has failed to present sufficient evidence of pretext to sustain the claim past summary judgment, as shown below.

### 2. Legitimate, Nondiscriminatory Reason for Demotion

The Defendant maintains that the Plaintiff was demoted from his supervisor position due to lack of confidence in the Plaintiff's ability to supervise an eight-hour production shift. The record reflects several areas of concern including: (1) attendance problems and non-compliance with timekeeping procedures by employees on the Plaintiff's shift that potentially exposed Protein Products to wage and hour law violations, (2) substandard production runs of chicken meal on the Plaintiff's shift that resulted in financial loss for Protein Products, (3) the Plaintiff's failure to otherwise maintain appropriate plant conditions to reduce operation costs on his shift, and (4) the Plaintiff's failure to attend a mandatory meeting concerning the Plaintiff's employment issues. The Plaintiff concedes that problems occurring on any supervisor's shift, including those that allegedly occurred on the Plaintiff's shift, are of legitimate concern to Protein Products. *See* Pl.'s Dep. [32-3] at 28–29.

With respect to the Plaintiff's alleged failure to ensure that employees on his shift adhered to the correct attendance and timekeeping procedures, the parties agree to the following: (1) Protein Products has a legal duty to pay its employees correctly for the number of hours they work; (2) this is a legitimate concern of Protein Products; (3) problems occurred on the Plaintiff's shift with employees not adhering to correct attendance and timekeeping procedures; and (4) the Plaintiff's immediate supervisor, Ralph Aderholt, who was then Protein Products' production manager, discussed these problems with the Plaintiff, as well as the Plaintiff's failure

9

to address the problem. Aderholt Aff. [32-7] ¶ 10; Pl.'s Dep. [32-3] at 21–25. Thus, this articulated reason for the demotion is undisputed by the parties.

With respect to the alleged substandard production runs, both parties agree to the following: (1) from 2009 through 2010, Protein Products' high-end customers (high-end pet food manufacturers) imposed more stringent standards for the chicken-based protein meal they purchased from Protein Products; (2) if a run of chicken meal failed to meet a customer's specifications, that customer likely would refuse to accept it which would entail a financial loss for Protein Products; and (3) the responsibility for meeting customer specifications fell entirely on the supervisor for each shift. Aderholt Aff. [32-7] ¶¶ 6, 8; Pl.'s Dep. [32-3] at 19–20. The Defendant contends that during the first half of 2010, there were repeated incidents of off-specification runs of chicken meal during the Plaintiff's production shift, including failure to ensure the antioxidant containers were hooked into the system and failure to conduct the required lab tests. Aderholt Aff. [32-7] ¶ 9. The Defendant further maintains that Protein Products notified the Plaintiff of these substandard production runs. *Id.* The Plaintiff argues that he was never aware that any substandard production runs had occurred on his shift and that "when a run goes in the bin you can't tell who put it in there because it goes in one tank." Pl.'s Dep. [32-3] at 19–20. The Plaintiff also maintains that Protein Products never brought to his attention that any substandard production runs had occurred on his shift. *Id.*

With respect to the Plaintiff's alleged failure to maintain appropriate plant conditions, the Defendant maintains that on June 2, 2010 the Plaintiff reported to then-production manager Aderholt that the Plaintiff's shift was "good." Aderholt Aff. [32-7] ¶ 13. However, the Defendant contends that after Aderholt conducted an examination of the facility following the Plaintiff's shift, Aderholt discovered several problems, including that "the conveyer line into the

cooker had run over, dumping oil and solids onto the floor of the plant" and "the employees under [the Plaintiff's] supervision had not cleaned up the mess, leaving it to be cleaned up by the employees on the next shift." *Id.* The Defendant maintains that Aderholt informed the Plaintiff of his failure to maintain appropriate plant conditions and to report the spillage by email. *Id.*; *see* June 2, 2010 Email [32-7] at 11.

The Defendant further maintains that due to the continued problems on the Plaintiff's shift, Aderholt made a surprise inspection visit to observe plant operations and conditions during Plaintiff's shift on July 2, 2010. Aderholt Aff. [32-7] ¶ 15. Aderholt stated that he observed several problems concerning sanitation, safety, and other quality issues. *See id.* The Defendant contends that Aderholt completed a disciplinary report concerning the problems on the Plaintiff's shift and that Aderholt asked the Plaintiff to sign the report to acknowledge that he had read and understood it, but the Plaintiff refused to do so. *Id.*; *see* July 5, 2010 Employee Warning/Disciplinary Report [32-7] at 13–14.

Although the Plaintiff concedes that a spillage problem occurred on his shift, the Plaintiff argues that spillage occurred on the other supervisors' shifts, as well. Pl.'s Dep. [32-3] at 27. The Plaintiff further argues that the employees on his shift "always would clean up." *Id.* at 27–28. The Plaintiff contends that he never received any email from Aderholt regarding a spillage problem and that "half the time [his email system] didn't work." *Id.* at 26. With respect to Aderholt's alleged surprise inspection of his shift, the Plaintiff testified he was not aware that such an inspection ever occurred, but even if it did, the Plaintiff was not made aware of any disciplinary report in connection with the inspection. *Id.* at 32–33.

Finally, the Defendant maintains that due to the continued problems, Protein Products scheduled a mandatory meeting in June 2010 with Aderholt (the Plaintiff's immediate

supervisor) and Charles Little (the plant's general manager), but the Plaintiff failed to attend this meeting or call to let Protein Products know he would not be able to attend the meeting. Aderholt Aff. [32-7] ¶ 14. The Defendant attaches an employee warning/disciplinary report concerning the incident citing the Plaintiff's alleged failure to follow instructions, mentioning that the Plaintiff would be suspended as a result, detailing nine continued problems on the Plaintiff's shift, and recommending possible dismissal if the incident were repeated. *See* June 18, 2010 Employee Warning/Disciplinary Report [32-7] at 12–14. Finally, the Defendant contends that the Plaintiff was suspended for three days as a result. Aderholt Aff. [32-7] ¶ 14.

The Plaintiff testified that no such meeting was ever scheduled between him and management in June of 2010 and that he could not remember ever missing a meeting he was asked to attend. Pl.'s Dep. [32-3] at 29–30. The Plaintiff further testified that he did not recall ever seeing the disciplinary report before it was handed to him during his deposition, and that he believes the report is fabricated because it was not signed by him. *Id.* at 30, 32. The Plaintiff also testified that he was never suspended, but was instead told to go home, get some rest, and come back in three days, because he had "been working too hard." *Id.* at 31.

The Defendant maintains that the Plaintiff was a faithful, long-term, generally good employee, but that he "had experienced problems supervising other employees and maintaining quality since the chicken line started and specifications became more stringent." Hilley Aff. [32-4] ¶ 12; Aderholt Aff. [32-7] ¶ 18. Consequently, the Defendant maintains that the decision was made to create a new position for the Plaintiff as lead operator, and to demote him from the supervisor position to the lead operator position but give him the same pay and benefits that he had received as a supervisor.

The Defendant contends that the Plaintiff's problems supervising his shift came to a head on July 15, 2010, and attaches a disciplinary report wherein it is noted that the Plaintiff had failed to follow instructions, specifically by failing to properly check storage tanks, resulting in an overflow on the chicken line, and by failing to fill out a mandatory spill report for the rework that was caused; the report also included a recommendation for demotion. July 16, 2010 Employee Warning/Disciplinary Report [32-7] at 15; Aderholt Aff. [32-7] ¶ 16.

The Court finds that assuming, *arguendo*, the Plaintiff established a prima facie case of racial discrimination, the Defendant articulated a legitimate, nondiscriminatory reason for its decision to demote him. It is undisputed that attendance and timekeeping problems occurred on the Plaintiff's shift which were never resolved by the Plaintiff. The Defendant has attached affidavits, employee disciplinary reports, and emails supporting the Defendant's lack of confidence in the Plaintiff's ability to supervise his shift. The Court is satisfied that the Defendant has articulated a legitimate, nondiscriminatory reason for the Plaintiff's demotion.

The Court next looks to the parties' factual disputes concerning the end of the Plaintiff's employment at Protein Products, and lastly examines whether the Plaintiff has established pretext.

### 3. Parties' Factual Disputes Concerning End of Plaintiff's Employment

Although the parties agree that the Plaintiff was demoted, the parties present different versions of other facts surrounding the end of the Plaintiff's employment at Protein Products.[5]

The parties agree that after the Plaintiff put in a request for a five-day vacation (1) the Plaintiff met with Little, the plant's general manager, on July 22, 2010 to discuss the Plaintiff's

---

[5] The Court notes that the Plaintiff testifies that Little told him in the meeting that Wagner, a Caucasian male, would replace him as supervisor on his shift. However, as the Court has detailed above, the Plaintiff then concedes that Wagner never actually replaced him, but returned back to Texas after a short training stint at the plant; the Plaintiff further testifies that he has no evidence that he was ever replaced by a Caucasian male. *See* Pl.'s Dep. [32-3] at 46, 48–49. Therefore, the Court will not consider this a point of disagreement between the parties.

employment; (2) during the meeting the Plaintiff was told that he would no longer be supervising his shift but would instead be placed in another position; and (3) this action was a demotion. However, the parties dispute whether the Plaintiff was told to call Protein Products to follow up about the lead operator position or whether the Plaintiff was told that someone at Protein Products would call him about the lead operator position. The Defendant contends that (1) the Plaintiff was told to consider the offer of demotion and then contact his managers once he returned to work after his vacation; (2) the Plaintiff made no further contact with the Defendant and never returned to the facility; and (3) when the Defendant made efforts to contact the Plaintiff, the Plaintiff stated that he was resigning instead of accepting the demotion. Thus, the Defendant maintains that the Plaintiff was not terminated from his position, but instead voluntarily resigned. The Defendant also contends that due to the sudden vacancy in the Plaintiff's supervisor position, Aderholt temporarily took over the Plaintiff's shift until McCaleb (an African-American male employee) could fill the position. The Plaintiff argues that Little told the Plaintiff that Protein Products would contact the Plaintiff when the lead operator position was available, but that Little never called the Plaintiff back about the position. *See* Pl.'s Dep. [32-3] at 37, 38. Instead, the Plaintiff argues that he called Protein Products twice on the Monday following his vacation to talk to Little, but Little never came to the phone; the Plaintiff argues that he next tried to call Little on his cell phone, but got no answer. *Id.* at 41–42, 45. The Plaintiff testified that he did not go to Protein Products to try to find out if the lead operator position was available because Little had instructed him to call. *Id.* at 44. The Plaintiff argues that he never declined to take the position as lead operator and he never resigned. *Id.* at 43–44; Pl.'s Resp. Opp'n to Def.'s MSJ [36] at 5. The Plaintiff further argues that he was never offered the same pay and benefits in the lead operator position, and "[i]t is [ludicrous] to believe the

14

Plaintiff decided to resign from a job making the same pay with the same benefits and less responsibility." Pl.'s Resp. Opp'n to Def.'s MSJ [36] at 2. The Plaintiff argues that he was terminated from his position on July 22, 2010, but then concedes that he has no facts or evidence to support that he was terminated. *See* Pl.'s Dep. [32-3] at 50.

### 4. Pretext

The Plaintiff argues that the Defendant's action of demoting him was pretext for race discrimination. The Plaintiff maintains that "the Defendant looked at the Plaintiff as another uneducated, expendable black worker who would never question anything the white supervisor and white plant manager did." Pl.'s Resp. Opp'n to Def.'s MSJ [36] at 5. The Plaintiff further maintains that the racial makeup in the Defendant's plant is "culturally unrepresentative," as "[t]here are no minorities in upper management/administration" and only "one African-American supervisor," despite that "[a]ll of the other workers are minorities except for one white male." Pl.'s Compl. [1] ¶ 3.

The Plaintiff contends that in almost twenty-two years of employment with the Defendant he was never written up or reported for misconduct until Wagner (a Caucasian male) was hired. Pl.'s Resp. Opp'n to Def.'s MSJ [36] at 5. The Plaintiff further contends that when he started working the night shift on or about 1997, he began encountering problems on his shift because "the earlier shifts would leave most of the clean-up work for the men on his shift, which caused problems with the workers he was supervising." *Id.* at 1–2. The Plaintiff also challenges the validity of the exhibits the Defendant attaches to its motion for summary judgment.

The Court finds that the Plaintiff has not presented sufficient competent evidence that the Defendant's proffered reasons for its actions were pretext. "[S]imply disputing the underlying facts of an employer's decision is not sufficient to create an issue of pretext." *LeMaire v. La.*

*Dep't of Transp. & Dev.*, 480 F.3d 383, 391 (5th Cir. 2007). The Court further finds no reason to doubt the validity of the documents attached to the Defendant's motion for summary judgment. The Plaintiff offers no evidence suggesting that he was demoted on the basis of his race as opposed to an effort to put him in a more suitable position. He concedes he has no evidence to support that he was replaced by a Caucasian male, admits that his supervisors never made racial comments to him, offers no proof of his unreturned phone calls to Protein Products regarding the availability of the lead operator position in the form of a phone record, and admits he has no other evidence to support that he was demoted and possibly terminated based on his race. *See* Pl.'s Dep. [32-3] at 52–53. Simply, the Plaintiff fails to call into question the legitimacy of Protein Product's stated reasons for his demotion.

The Court is aware that the Plaintiff may have been treated unfairly by Protein Products. He worked for Protein Products for twenty-two years. The company thought enough of him to keep him in the supervisor position for approximately ten years. It is understandable that the Plaintiff would feel wronged by a demotion under these circumstances. It is also questionable whether Protein Products actually offered him a demotion for the same pay and benefits he received in the supervisor position. However, the Court's "job as a reviewing court conducting a pretext analysis is not to engage in second-guessing of an employer's business decisions." *See LeMaire*, 480 F.3d at 391.

This case does not hinge on the Plaintiff's allegations of general unfairness. The case hinges on whether the Plaintiff can sustain a race discrimination claim past summary judgment. The Court finds that he cannot, as he has not offered sufficient evidence to support his race discrimination claim. Thus, there is no genuine dispute of material fact present in this case that

would preclude summary judgment on the Plaintiff's Section 1981 race discrimination claim, and the Court finds that this claim is properly dismissed.

*D. Conclusion*

In sum, the Court finds that the Defendant's motion for summary judgment [32] should be GRANTED on all the Plaintiff's claims, and that the Plaintiff's case should be DISMISSED.

A separate order in accordance with this opinion shall issue this day.

THIS, the 7th of February, 2013.

_____
SENIOR JUDGE